IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANGELA CAMPLESE, :
    Plaintiff : No. 1:15-cv-00784
    v. :
    : (Judge Kane)
MORGAN STANLEY SMITH :
BARNEY, LLC, :
    Defendant :

# MEMORANDUM

Pending before the Court is Defendant Morgan Stanley Smith Barney LLC's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 31.) For the reasons set forth below, the Court will grant Defendant's motion.

## I. BACKGROUND

Beginning in 1990, Plaintiff Angela Camplese worked for Defendant Morgan Stanley Smith Barney LLC ("Morgan Stanley") as a broker in Harrisburg, Pennsylvania. (See Doc. No. 27 ¶¶ 3-5.) Plaintiff handled financial accounts for Defendant including the investments of the Catholic Diocese of Harrisburg ("the Diocese"). (Id. ¶ 7.) In June 2006, Plaintiff took a four-month medical leave of absence and, after being approved in October 2006 to return to work, took additional medical absences due to her impaired health.[1] (Id. ¶¶ 10-11, 108.) Plaintiff alleges that Doug Berlin, Defendant's Harrisburg Branch Manager and Vice President, repeatedly commented and inquired about Plaintiff's absences from work for "a period of two years." (Id. ¶¶ 6, 13-14, 109.) Berlin also purportedly asked Plaintiff's brother, Joseph

---

[1] In her discussion about the events in 2008, Plaintiff also alleges that (1) the assistant of her brother, Joseph Camplese, resigned due to Doug Berlin's "heavy-handed tactics" and (2) Plaintiff received a monetary settlement as a consequence of a class action suit filed by female brokers employed at Morgan Stanley. (Doc. No. 27 ¶¶ 12, 15-18, 40.) At some unknown time, Plaintiff alleges that she was "refused a window office, based on her alleged low production, even though her production was better than that of several male brokers." (Id. ¶ 98.)

1

Camplese, who also worked for Defendant, about Plaintiff's absences during this period.  (Id. ¶ 14.)  Berlin's statements included the question: "where's your sister[?]"  (Id. ¶ 15.)

Subsequently, in June of 2008, Plaintiff broke her thumb, which required her to undergo two surgeries, attend physical therapy, and wear a large brace for a period of time.  (Id. ¶¶ 12, 104-106.)  Plaintiff complains that, during this period, Berlin allegedly commented to Plaintiff about the "need to 'dress appropriately,'" as Plaintiff wore "loose fitting clothing" due to the hand brace.  (Id. ¶¶ 105-107.)  Additionally, in June 2008, Plaintiff asked Berlin and Chris Maillie, Vice President and Regional Complex Manager for Defendant, for assistance with the Diocese's investment accounts.  (Id. ¶¶ 19-20.)  Plaintiff and her brother Joseph Camplese had recently lost the Diocese's bond accounts in May 2008, and Plaintiff purportedly sought to retain the Diocese's remaining accounts by proposing a trip with Diocesan officials to New York.  (See id. ¶¶ 22-23, 26.)  Plaintiff sent an e-mail to Berlin and approached him about the New York trip.  (Id. ¶¶ 24, 31-32.)  Maillie allegedly did not respond to Plaintiff's e-mails asking for assistance to retain the Diocese's account.  (Id. ¶ 34.)

According to Plaintiff, on September 3, 2008, Plaintiff realized that the Diocese's equity accounts were leaving Defendant Morgan Stanley.  (Id. ¶ 35.)  During a meeting with Berlin, Plaintiff claims that she faced "ranting criticism" about the loss of the Diocese's accounts and that Berlin expressed concern about how to justify employing two full-time brokers following the Diocese's departure.  (Id. ¶¶ 41-42.)  Joseph Camplese was fired on November 25, 2008.  (Id. ¶ 40.)  Plaintiff alleges that, following Joseph Camplese's termination and the loss of the Diocese's account, the "hostile work environment perpetrated against the Plaintiff on an ongoing basis became even more severe."  (Id. ¶ 44.)

On March 9, 2010, some fifteen months after Joseph Camplese's termination, Attorney Ira Weinstock, on behalf of Joseph Camplese, sent a letter to Defendant's human resources director. (Id. ¶ 63.) The March 9, 2010 letter concerned the manner in which Defendant terminated Joseph Camplese and requested a meeting for Plaintiff.[2] (Doc. No. 27-1 at 1; see Doc. No. 27 ¶ 46.) A year later, on March 31, 2011, Plaintiff received a "production letter"[3] from Defendant (Doc. No. 27 ¶ 45), and Plaintiff later met with Berlin and Richard Maratea, Senior Vice President for Defendant, to discuss ways to improve Plaintiff's production and her disappointment in management's behavior (Doc. No. 27-5 at 1; see Doc. No. 27 ¶ 67). Thereafter, at some point in the fall of 2011, a co-worker Fred O'Dell allegedly began suggesting to Plaintiff that she "was going to get fired."[4] (Doc. No. 27 ¶¶ 48, 122-123.) Plaintiff alleges that O'Dell's comments reflected his desire for "Plaintiff to partner with him to work jointly to enhance O'Dell's book of business and to protect Plaintiff from termination." (Id. ¶ 73.)

In January 2012, Plaintiff twice contacted Kris Salimondo, Human Resources Officer for Defendant. (Id. ¶¶ 71, 72.) On January 24, 2012, Plaintiff mentioned to Salimondo that she "wanted to try to transfer to another position within the Defendant's network that would have removed her from the hostile environment she was experiencing with Doug Berlin." (Id. ¶ 71; see Doc. No. 27 ¶ 114.) Subsequently, on January 31, 2012, Plaintiff informed Salimondo about O'Dell's "constant harassment," discussed entering into a broker's partnership at another one of Defendant's branches, and discussed how "male brokers in New York" received better treatment

---

[2] Plaintiff attaches to her revised second amended complaint the e-mail correspondences on August 6, 2010 and November 18, 2010 between Attorney Weinstock and Defendant's counsel. (Doc. Nos. 27-3 at 1; 27-4 at 1.) Plaintiff also attaches a November 7, 2011 letter sent by Attorney Weinstock that references Plaintiff's request for a meeting and "growing frustration" for being "routinely tested on legal and ethical issues." (Doc. Nos. 27 ¶ 69; 27-6 at 1.)

[3] Plaintiff also refers to the March 31, 2011 letter in her revised second amended complaint as a "probationary letter." (Doc. No. 27 ¶ 67.)

[4] Plaintiff appears to allege that O'Dell's comments continued until either July 2012 or September 2012. (See Doc. No. 27 ¶ 74, 86, 90-91.)

than she received.  (Doc. No. 27 ¶¶ 52, 72, 75, 124; see Doc. No. 27 ¶ 94.)  Plaintiff called Salimondo in February 2012 to discuss finding a different position and again in March 2012 to discuss working for the Morgan Stanley Foundation.  (Id. ¶¶ 77, 78.)  Plaintiff alleges that, despite multiple conversations, Salimondo did not provide Plaintiff "with any conclusions regarding her promised efforts to investigate the Plaintiff's concerns."[5]  (Id. ¶ 80.)

Around August 2012, Plaintiff claims that she discussed "transitioning her book of business with fellow brokers Fred O'Dell and Tyler Lenda;" however, her efforts were unsuccessful due to personal issues between O'Dell and Lenda.  (Id. ¶¶ 86-87.)  At some point thereafter, Plaintiff alleges that she took the position as a Registered Marketing Associate to O'Dell and gave up her Vice President title in order to preserve her broker's licenses and in response to "Defendant['s]" "constant[] haranguing" her for "low production."  (Id. ¶¶ 88-91.)  On December 18, 2012, Plaintiff left Defendant Morgan Stanley and took a non-broker position with another organization.  (See id. ¶¶ 54, 92.)  Plaintiff alleges that her resignation amounted to a "constructive discharge because of the poisoned atmosphere" and Defendant "destroying her ability to make a living."  (Id. ¶¶ 54, 113.)

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on September 24, 2013 and was issued a right to sue letter on October 28, 2014.  (Doc. Nos. 17 at 3, 7; 27 ¶ 59.)  Plaintiff filed a complaint in the Court of Common Pleas of Monroe County, Pennsylvania on March 16, 2015, and Defendant removed the action on April 21, 2015.  (Doc. No. 1.)  Plaintiff filed an amended complaint on June 16, 2015.  (Doc. No. 14.)  On March 11, 2016, this Court dismissed Plaintiff's amended complaint pursuant to Federal

---

[5] Plaintiff's revised second amended complaint also discusses how Plaintiff unsuccessfully applied in April 2012 and May 2012 for two positions.  (Doc. No. 27 ¶¶ 81-83.)

4

Rule of Civil Procedure 12(b)(6) and granted Plaintiff leave to file a second amended complaint. (Doc. Nos. 24, 25.)

Plaintiff filed a second amended complaint on March 24, 2016. (Doc. No. 26.) Plaintiff later filed a second amended complaint (revision) ("revised second amended complaint") on March 29, 2016. (Doc. No. 27.) In the revised second amended complaint, Plaintiff brings claims of constructive discharge and hostile work environment against Defendant under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–16 (Title VII), and under the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. (ADA). (Id.) Plaintiff also asserts that Defendant unlawfully retaliated against Plaintiff in violation of Title VII and the ADA. (Id.) Namely, Plaintiff alleges that: (1) "Defendant has applied more lenient personnel policies and procedures" to Defendant's male employees; (2) she expressed her concern with Salimondo that "male brokers were being treated better and given more leniency than female brokers;" (3) she faced discrimination and harassment "based on her disability;" and (4) Defendant operated under "a retaliatory animus." (Id. ¶¶ 94, 97, 110, 116.) On April 11, 2016, Defendant filed a second motion to dismiss Plaintiff's revised second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 31.) The motion to dismiss has been fully briefed and is ripe for disposition.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may

5

nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it "fail[s] to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (citing Twombly, 550 U.S. at 556). A court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).

All civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, or they risk dismissal. See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). To determine the sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has identified the following steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement for relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

## III. DISCUSSION

### A. Whether Plaintiff's constructive discharge claims are time-barred

Defendant Morgan Stanley moves the Court to dismiss Plaintiff's Title VII and ADA claims as time-barred. (Doc. No. 31; 32 at 5.) Defendant stresses that the revised second amended complaint fails to allege a discriminatory act – besides Plaintiff's December 18, 2012 resignation – that occurred after November 28, 2012. (Doc. No. 32 at 12.) Plaintiff responds that "harassment both inside and outside the 300 day period was committed" and that she has demonstrated "at least one discriminatory act, Defendant's constructive termination of her, which occurred within the filing period." (Doc. No. 35 at 6, 10.)

"Under the ADA and Title VII, a complainant has 300 days from the alleged unlawful employment practice to file a charge of employment discrimination with the EEOC . . . ." Patterson v. AFSCME # 2456, 320 F. App'x 143, 145 (3d Cir. 2009) (citing 42 U.S.C. § 2000e–5(e)(1); 42 U.S.C. § 12117(a)). Plaintiff filed a charge of discrimination with the EEOC on September 24, 2013. (Doc. No. 18-2 at 3-4.) Therefore, a discriminatory act must have occurred on or after November 28, 2012 in order for Plaintiff's Title VII and ADA claims to be timely. See Aubrey v. City of Bethlehem, Fire Dep't, 466 F. App'x 88, 92 (3d Cir. 2012). Here, the only alleged act that occurred on or after November 28, 2012 is Plaintiff's December 18, 2012 resignation. (Doc. No. 27 ¶ 54.) Absent an exception to the 300-day filing requirement, the discriminatory acts that form the basis of Plaintiff's revised second amended complaint are time-barred.

The continuing violation doctrine is an "equitable exception" to the aforementioned filing requirement. Shenkan v. Potter, 71 F. App'x 893, 894-95 (3d Cir. 2003). The doctrine applies where the discriminatory conduct "is part of a continuing practice," id., and aggregates discriminatory acts that are not individually actionable into a "hostile work environment claim."[6]

---

[6] The continuing violation doctrine does not preserve time-barred claims for discriminatory acts that are individually actionable such as: "termination, failure to promote,

7

O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006). In order to establish a continuing violation, a plaintiff must (1) "demonstrate that at least one act occurred within the filing period," and (2) "that the harassment is more than the occurrence of isolated or sporadic acts of intentional discrimination." West v. Phila. Elec. Co., 45 F.3d 744, 754-55 (3d Cir. 1995) (internal quotations omitted); see Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013); Snyder v. Baxter Healthcare, Inc., 393 F. App'x 905, 909 (3d Cir. 2010). A charge alleging a hostile work environment or a constructive discharge, Suders, 542 U.S. at 149, "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." See Morgan, 536 U.S. at 122 (emphasis added); Snyder, 393 F. App'x at 909 ("[W]hen a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period. . . .") (quoting Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am, 927 F.2d 1283, 1295 (3d Cir. 1991)).

Last year, in Green v. Brennan, the United States Supreme Court determined that an employee's resignation – rather than the employer's "last discriminatory act" – triggers "the limitations period for a constructive-discharge claim." Green v. Brennan, 136 S. Ct. 1769, 1782 (2016). In that case, a postmaster for the United States Postal Service complained in 2008 that he was denied a promotion because of his race. Id. at 1774. The postmaster's relations with his supervisors subsequently deteriorated and he was accused of intentionally delaying the mail. Id. On December 16, 2009, the postmaster and the Postal Service agreed that he would leave his post and that criminal charges would not be pursued as to the delay of mail accusations. Id. The postmaster submitted his resignation on February 9, 2010 and contacted an Equal Employment

---

denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation." O'Connor, 440 F.3d at 127. An alleged discrete discriminatory act that occurred prior to November 28, 2012 is time-barred and will not support Plaintiff's suit. Id.

Opportunity ("EEO") counselor on March 22, 2010 "to report an unlawful constructive discharge."[7] Id. The Supreme Court concluded that the limitations period for the postmaster's "constructive-discharge claim r[an] from the date he gave notice of his resignation" and remanded the case to determine "when exactly" the postmaster gave his notice of resignation. Id. at 1782.

Therefore, upon consideration of the Supreme Court's decision in Green v. Brennan, the Court will not dismiss Plaintiff's constructive-discharge claims as time-barred because Plaintiff has adequately alleged that an "act" fell within the limitations period: Plaintiff's December 18, 2012 resignation. See id. at 1780-81. The Court turns next to whether Plaintiff has alleged "more than the occurrence of isolated or sporadic acts" of discrimination in her revised second amended complaint. See Ozoroski v. Maue, 460 F. App'x 94, 97 (3d Cir. 2011) (quoting Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001)).

### B. Continuing practice or isolated acts of intentional discrimination

Defendant contends that "Plaintiff's allegations are sporadic and incapable of creating a continuing violation." (Doc. No. 32 at 15.) Plaintiff responds that the continuing violation doctrine permits her to "challenge all of the offensive conduct" so long as the "acts occurring within 300 days of [her] charge were part of the same hostile work environment as the earlier harassment." (Doc. No. 35 at 6.)

The Third Circuit has instructed district courts to consider two factors when "distinguishing continuing violations from isolated occurrences:" subject matter and frequency. Shenkan, 71 F. App'x at 895 (citing Cowell, 263 F.3d at 292); see Bennett v. Susquehanna Cty. Children & Youth Servs., 592 F. App'x 81, 84 n.3 (3d Cir. 2014) (citing Mandel v. M & Q

---

[7] "A charging party is generally required to file a charge within 180/300 days after the alleged unlawful employment practice occurred. A federal sector complainant must initiate the EEO process within 45 days." 2-IV TIMELINESS, EEOCCM s 2-IV.

Packaging Corp., 706 F.3d 157, 166 & n.4 (3d Cir. 2013)). The subject matter prong concerns "whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation." Cowell, 263 F.3d at 292. The frequency prong asks "whether the acts are recurring or more in the nature of isolated incidents." Id.

Here, as it relates to the period between 2006 and 2008, the revised second amended complaint references the following: (1) Berlin's repeated inquiries into Plaintiff's medical absences in 2006, 2007 and 2008 (Doc. No. 27 ¶¶ 6, 13-14, 109); (2) Berlin's commentary regarding Plaintiff's need to "dress appropriately" in 2008 (id. ¶¶ 12, 105-107); (3) Berlin's and Chris Maillie's failure to respond to emails about organizing a trip to New York (id. ¶¶ 24-34); (4) Berlin's criticism of Plaintiff in September 2008 about the loss of the Diocese's accounts (id. ¶ 41); (5) Berlin's commentary that Defendant could not justify two full-time brokers (id. ¶ 42); and (6) the firing of Plaintiff's brother on November 25, 2008 (id. ¶ 40).[8] As for 2009 and 2010, Plaintiff attaches two letters dated March 9, 2010 and May 5, 2010 requesting a private meeting for Plaintiff. (Doc. No. 27-1 at 1; 27-2 at 1.) Attorney Ira Weinstock – who represented Joseph Camplese – sent the two letters and discussed alleged "policy violations leading up to" Joseph Camplese's termination in November 2008. (Doc. No. 27-1 at 1; 27-2 at 1.) The two letters do not address Plaintiff's concerns and do not reference any events in 2009 or 2010 beyond the request for a private meeting between Defendant and Plaintiff.[9] (Id.)

---

[8] "The Plaintiff believes, and therefore avers, that with respect to male employees of the Defendant, the Defendant has applied more lenient personnel policies and procedures than those which were applied to Plaintiff." (Doc. No. 27 ¶ 97.)

[9] Plaintiff appears to characterize the March 9, 2010 letter and the May 5, 2010 letter – both attached to the revised second amended complaint – as indicative of her efforts for "several years attempting to have the Defendant acknowledge her concerns regarding the hostile environment she was encountering while attempting to discharge her duties." (Doc. No. 27 ¶¶ 62-66.)

However, as it pertains to events in 2011 and 2012, the revised second amended alleges that: (1) Plaintiff received a "production letter" on March 31, 2011 (Doc. No. 27 ¶ 45); (2) Plaintiff discussed ways to improve her production with Berlin and Richard Maratea (Doc. No. 27-5 at 1; see Doc. No. 27 ¶ 67); (3) O'Dell began to comment from the fall of 2011 until either July 2012 or September 2012 that Plaintiff "was going to get fired" because "O'Dell wanted the Plaintiff to partner with him to work jointly to enhance O'Dell's book of business and to protect Plaintiff from termination" (Doc. No. 27 ¶¶ 48, 73-74, 86, 90-91, 122-123); (4) Plaintiff discussed with Salimondo in January 2012 about her desire to transfer to another position within Defendant's network due to "the hostile environment" she experienced with Berlin, her interest in entering into a broker's partnership with her brother-in-law, and O'Dell's "constant harassment" (id. ¶¶ 71-72, 75, 124); (5) Plaintiff took the position as a Registered Marketing Associate to Fred O'Dell; and (6) Plaintiff resigned from Defendant Morgan Stanley on December 18, 2012.

Despite taking the aforementioned allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Court finds that the revised second amended complaint fails to sufficiently allege more than sporadic acts of discrimination. The revised second amended complaint only alleges three reoccurring acts: (1) Berlin's repeated comments about Plaintiff's medical absences between 2006 and 2008; (2) Berlin's remarks about Plaintiff's attire in 2008; and (3) O'Dell's comments that Plaintiff was "going to get fired." (Doc. No. 27 ¶¶ 14, 122.) First, as to the subject matter prong, Plaintiff does not adequately allege that the three reoccurring acts constitute the same type of discrimination. Plaintiff claims that Berlin's alleged comments or inquiries about her medical absences and the need to "dress appropriately" constitute discrimination "based on her disability." (Id. ¶¶ 14, 102-110.) However, Plaintiff

11

makes no allegation or otherwise permits this Court to infer that O'Dell's harassing remarks in 2011 and 2012 concerned Plaintiff's disability.

Second, as to the frequency prong – even if this Court were to infer that these three reoccurring violations constitute the same type of discrimination – the hiatus between Berlin's conduct in 2008 and O'Dell's statements in the fall of 2011 precludes the Court from drawing a reasonable inference that a "persistent, ongoing pattern" of discrimination occurred between 2008 and 2011. See Coombs v. Target Corp., No. 12-4651, 2013 WL 664186, at *4 (E.D. Pa. Feb. 25, 2013) (addressing "a two-year break between allegations of discrimination") (collecting cases); see Hamera v. Cnty. of Berks, 248 F. App'x 422, 424 (3d Cir. 2007) (addressing a "four-year gap between the allegedly discriminatory comments").

Finally, this leaves one reoccurring act as alleged in the revised second amended complaint: O'Dell "constantly telling [Plaintiff] she was about to be fired, because O'Dell wanted the Plaintiff to partner with him to work jointly to enhance O'Dell's book of business and to protect Plaintiff from termination." (Doc. No. 27 ¶ 73.) "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat [ion] ... because of ... sex.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); see Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002). However, "[f]acially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." Chavez v. New Mexico, 397 F.3d 826, 833 (10th Cir. 2005). Here, the revised second amended complaint is devoid of allegations that permit this Court to infer that O'Dell's harassing comments had any link or correlation to Plaintiff's gender or disability. See Alfano, 294 F.3d at 377. Rather, Plaintiff avers that O'Dell's remarks reflected a desire for "Plaintiff to partner with

12

him to work jointly to enhance O'Dell's book of business and to protect Plaintiff from termination." (Id. ¶ 73.)

Accordingly, for the reasons discussed above, the Court finds that Plaintiff has failed to allege facts sufficient to invoke the continuing violation doctrine. Plaintiff's Title VII and ADA claims in Counts I and II of the amended complaint are therefore time-barred. Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994).

### C. Whether Plaintiff adequately alleged a retaliation claim

Defendant also urges the Court to dismiss Plaintiff's retaliation claim brought in Count III under Title VII and the ADA. (Doc. No. 32 at 18.) Defendant argues that Plaintiff has failed to plead the elements of her retaliation claim and stresses that the "sporadic discriminatory conduct Plaintiff alleges is insufficient to demonstrate a pattern of antagonism." (Id. at 18-20.) Plaintiff does not address the retaliation claim brought in Count III in her brief in opposition to the pending motion to dismiss. (Doc. No. 35.)

In order to state a claim for retaliation under Title VII or the ADA, a plaintiff must adequately allege that: (1) she engaged in some protected activity; (2) the "employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." See Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006); see also Davis v. Davis Auto, Inc., 509 F. App'x 161, 163 (3d Cir. 2013). As to the causal connection requirement, the Third Circuit has identified two factors for the district court to consider: "(1) the 'temporal proximity' between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the 'intervening period.'" Hussein v. UPMC Mercy Hosp., 466 F. App'x 108, 112 (3d Cir. 2012) (internal citations omitted).

Here, the revised second amended complaint alleges that "the ultimate constructive discharge of the Plaintiff's employment" on December 18, 2012 reflected Defendant's "retaliatory animus." (Doc. No. 27 ¶ 116.) More concretely, Plaintiff appears to allege that she was constructively discharged on December 18, 2012 in retaliation for her 2008 medical absences, her receipt of a settlement in a class action lawsuit in 2008, the March 9, 2010 and May 5, 2010 letters requesting a private meeting, and her "telephone interview" on January 31, 2012 with Salimondo. The respective four-year and two-year gap between the December 18, 2012 alleged constructive discharge and her prior medical absences, participation in a 2008 class action settlement, and requests for a private meeting do not permit the inference of a causal connection between the protected activity and the alleged discrimination. With respect to the January 31, 2012 telephone interview, the ten-month gap between January 31, 2012 and December 18, 2012 and the absence of any alleged discriminatory acts during the "intervening period" similarly fail to sufficiently "raise a plausible inference of causation" between the January 2012 conversation and the December 18, 2012 alleged constructive discharge. See Gooden v. Pennsylvania, No. 10-3792, 2010 WL 5158996, at *5 (E.D. Pa. Dec. 10, 2010) (granting a motion to dismiss where the "temporal separation simply could not support an inference of causation"). Accordingly, the Court will dismiss Count III as it fails to state a claim upon which relief can be granted.

## IV. CONCLUSION

Based on the foregoing, the Court will grant Defendant's motion to dismiss the revised second amended complaint in its entirety. An order consistent with this Memorandum follows.